NOT DESIGNATED FOR PUBLICATION

No. 123,188

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

JERRY W. CAMPBELL,
*Appellant*.

MEMORANDUM OPINION

Appeal from Douglas District Court; PAULA B. MARTIN, judge. Opinion filed May 13, 2022. Reversed and remanded.

*Kasper Schirer,* of Kansas Appellate Defender Office, for appellant.

*Brian Deiter*, assistant district attorney, *Suzanne Valdez*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before MALONE, P.J., SCHROEDER and HURST, JJ.

PER CURIAM: Following a bench trial, the district court convicted Jerry W. Campbell of possession of methamphetamine with the intent to distribute, felony possession of drug paraphernalia, misdemeanor possession of drug paraphernalia, and driving while license suspended. The district court sentenced Campbell to 111 months on the distribution conviction and ran the other convictions concurrent. On appeal Campbell alleges the district court erred in several ways:  1) by failing to fully advise him of his jury trial right before accepting his waiver; 2) by denying his motion to suppress

1

evidence; 3) by admitting prior bad acts evidence; 4) by applying an unconstitutional statutory rebuttable presumption for intent to distribute methamphetamine; and 5) that cumulative error below denied him a fair trial. This court agrees with Campbell in part, finding the district court failed to obtain a proper jury trial waiver and erred in denying his motion to suppress. Finding such error entitled Campbell to a new trial, this court declines to address his remaining claims. This court reverses Campbell's convictions and remands for a new trial.

FACTUAL AND PROCEDURAL BACKGROUND

The State charged Campbell with level 2 felony possession of methamphetamine with intent to distribute, level 5 felony possession of drug paraphernalia, class B misdemeanor possession of drug paraphernalia, and class B misdemeanor driving while license suspended for actions that occurred on July 18, 2017. The district court held a bench trial on March 26, 2019, where it found Campbell guilty of all four counts. The district court sentenced Campbell to a 111-month prison sentence on the distribution charge and ran all other charges concurrent.

I.      *July 18 Traffic Stop*

Kristen Kennedy, an officer with the Lawrence Police Department drug enforcement unit (DEU), saw Campbell driving a light blue Saturn in Lawrence on July 18, 2017, and recognized him as the target of an ongoing methamphetamine investigation and knew his driver's license was suspended. Officer Kennedy ran the tag for the car Campbell was driving, but it was registered to a red Saturn. Officer Kennedy began following Campbell and witnessed him back his car into a parking stall at an apartment complex and watched a woman get into the front passenger seat of Campbell's car. Officer Kennedy testified that after two or three minutes, the woman got out of Campbell's car and Campbell immediately left the parking lot. Officer Kennedy

2

continued to follow Campbell in her unmarked car and contacted Officer Justin Trowbridge to execute a stop on Campbell's car.

Officer Trowbridge stopped Campbell's car in the parking lot of a different apartment complex, and the officer's dashboard camera recorded the traffic stop and the subsequent vehicle search. At that same time, two additional DEU officers responded to the apartment complex where Officer Kennedy witnessed the interaction between Campbell and the woman in Campbell's car. The officers' intent was to obtain evidence of a drug sale.

Within about twenty seconds of stopping Campbell's car, Officer Trowbridge approached the driver's side door and informed Campbell that his vehicle was stopped because the tag on his car belonged to a red Saturn, rather than the blue Saturn Campbell was driving. Campbell explained that he recently purchased the car and switched tags from another car and also told Officer Trowbridge his license was suspended. Officer Kennedy then approached the passenger side of the vehicle to assist in the stop. Officer Trowbridge asked if there were any weapons in the car, and Campbell said he had a knife in his pocket and a firearm tucked between his seat and the console. Officer Trowbridge then opened the driver's door and had Campbell get out of the car and searched his person. He retrieved the knife from Campbell's pocket. A third officer approached the vehicle stop and Officer Trowbridge told Campbell to walk toward the police car with that officer.

Officer Trowbridge then asked Campbell to verify the firearm location, and Campbell explained its exact location in the vehicle. At approximately four minutes into the traffic stop, Officer Trowbridge asked Campbell if he could get the gun out of the car to ensure officer safety. Campbell agreed to this request, and Officer Trowbridge began searching the vehicle for the firearm. Officer Kennedy and another officer on scene stood with Campbell while Officer Trowbridge secured the gun. Officer Trowbridge then

3

searched the vehicle for about two minutes and told Campbell the gun was stuck and not easy to remove. As Officer Trowbridge continued to try and retrieve the gun, about six minutes into the stop Officer Kennedy placed Campbell in handcuffs for "safety reasons," but did not place him under arrest at that time.

The dashboard camera footage shows that Officer Trowbridge had possession of Campbell's firearm at approximately nine minutes into the stop and described its condition to Officer Kennedy. Officer Trowbridge testified that—after securing the gun, clearing it of ammunition, and confirming it was not stolen—he conducted what he referred to as a "protective sweep" of the car. This occurred while Campbell was handcuffed in the distance with another officer. Officer Trowbridge testified that this meant he looked in the immediate area of the driver's seat and opened the center console of the car. He said when he opened the console, he saw what he believed to be a methamphetamine pipe with white residue.

Officer Trowbridge testified that at the point in time when he had secured the gun—he had seen no controlled substances or drug paraphernalia in the car. At about 11 minutes into the stop, Officer Trowbridge told Officer Kennedy that during his protective sweep he located what appeared to be a meth pipe. Officer Kennedy responded to Officer Trowbridge, saying they should do a search of the entire car, and that she had already been informed that Campbell was in legal possession of the gun, so they would be unable to charge Campbell with illegal possession of a weapon.

The officers then conducted a full search of Campbell's vehicle. Officer Trowbridge proceeded to search the vehicle for about six minutes before Officer Kennedy received a call from one of the officers investigating Campbell's contact with the woman at the apartment complex—informing Officer Kennedy that the woman who got into Campbell's car told the officer Campbell had sold her methamphetamine. Officer Kennedy testified that before she received the phone call about 18 minutes into the stop,

4

they had a reasonable suspicion that Campbell had made an illegal sale of drugs, but after the phone call, they had probable cause that he made an illegal sale of drugs. Officer Kennedy can be heard telling the officer on the phone that they had found the drug paraphernalia but could not locate the methamphetamine. About five minutes after Officer Kennedy received the phone call, Officer Trowbridge found suspected methamphetamine and money inside a hat on the front passenger floorboard in Campbell's car. A Kansas Bureau of Investigation scientist later confirmed it was 9.95 grams of methamphetamine, packaged in four bags of varying weights.

Officer Trowbridge then approached Campbell, who was handcuffed and outside the view of the dashboard camera. Officer Trowbridge asked Campbell where he was coming from, and Campbell responded that he was coming from the Country Club apartments. Officer Trowbridge asked Campbell, "Who did you talk to over there?" Campbell responded, "I dropped off a girl named [K.]." Officer Trowbridge then asked Campbell what he sold that person for $20, and Campbell responded that "I didn't sell her anything." Officer Trowbridge then told Campbell he was being arrested for possession. Campbell asked, "Possession of what?" Officer Trowbridge responded, "methamphetamine," and Campbell said, "but I don't have anything." Officer Trowbridge and Campbell then exchanged a few more words regarding the location of the methamphetamine and Officer Trowbridge then said, "well we'll talk about that later." When Campbell requested to be cuffed in front so he could have a cigarette, Officer Trowbridge conducted a more thorough search of Campbell's person while standing by the police car and away from Campbell's car.

Officer Trowbridge then confirmed with someone at the scene who was purportedly able to authorize parking at the apartment complex that Campbell's car could remain in the parking lot for a couple of days. Officers Trowbridge and Kennedy continued searching Campbell's car for almost 10 additional minutes. Officer Trowbridge returned to the patrol car where Campbell was cuffed, and Campbell said, "So where was

5

this stuff at?" Officer Trowbridge said, "Well man, you're in custody now. I can't talk to you unless I Mirandize ya at this point about it, so . . . self-incrimination man." Campbell said he understood and then asked Officer Trowbridge the potential jail sentence for a charge like this and Officer Trowbridge said, "I don't know, I know that it's a felony related charge so you're gonna have to see a judge before you get out" and then they discussed the likelihood of Campbell getting out of jail that same evening. After a short time, Campbell said, "So you're telling me that chick left something in my fucking car then or something?" Officer Trowbridge responded "No, no, I can't talk to you about that man, you know that." Officer Trowbridge and Officer Kennedy then finished their search of the car.

II.      *The Woman in Campbell's Car*

Officer Reid Walter began following Campbell at Officer Kennedy's request and saw Campbell pull into the apartment complex parking lot. Officer Walter observed a woman leave a nearby apartment building, get into Campbell's car, and leave about three minutes later. She then walked toward the apartment building's laundry center and had an about five-minute long conversation with three people outside, before she left that area and returned to her apartment.

Once the woman returned to her apartment, Officer Walter and Detective Sam Harvey went to her apartment where the woman invited them both inside. Officer Walter testified that he told her that they believed she had just purchased methamphetamine from Campbell. They did not search her or her apartment, but she did allow them to look at her cell phone and take photographs of her communications with a contact in her phone under Campbell's name. The communications included discussions between the woman and the Campbell contact two days preceding the July 18 traffic stop that supported officers' belief that she bought narcotics from Campbell that morning.

6

Officer Walter testified that the clock on the woman's phone was an hour behind, but the last text message from Campbell's contact was delivered at 11:23 a.m.—about the same time Campbell pulled into the woman's parking lot. Officer Walter testified that after obtaining the information from the woman's phone, he relayed it to Officer Kennedy while she and Officer Trowbridge were conducting Campbell's traffic stop.

### III.    *Campbell's Pretrial Motions and Hearings*

After the State charged Campbell, he moved to suppress the evidence discovered in his car during the traffic stop, arguing it stemmed from an illegal search. The district court held a suppression hearing on May 18, 2018, where the State conceded that the vehicle search that occurred before the approximate 18-minute mark of the stop was illegal because it occurred before Officer Kennedy received the phone call establishing probable cause. But the State argued that the inevitable discovery exception applied, so the evidence should not be excluded from trial, and the district court ultimately agreed with the State. The district court explained that Officer Trowbridge's search of the car exceeded Campbell's consent to obtain the gun and that Campbell's traffic offenses did not justify a search of his vehicle. However, the district court found that the State met its burden of proving by a preponderance of the evidence that any evidence obtained from the unlawful search would have been inevitably discovered because there was independent probable cause to search the vehicle as a result of the woman at the apartment complex providing text messages that corroborated officers' belief that she bought methamphetamine from Campbell.

The district court held another pretrial hearing on March 21, 2019, addressing several matters in this case and two other cases involving Campbell that were pending before the same judge. The State sought to introduce evidence that methamphetamine had been found in Campbell's car during a separate car search in May 2017, arguing Campbell's statements at the scene that someone must have left something in his car, was

7

an innocent explanation putting intent at issue such that prior bad acts evidence should be admitted pursuant to K.S.A. 60-455. The district court granted the State's motion over defense counsel's objection. After ruling on the State's K.S.A. 60-455 motion, Campbell's counsel advised the district court that Campbell "may want to actually waive his jury trial and proceed, try to proceed on a stipulated facts trial." Campbell's counsel said that Campbell "indicated to me he was leaning heavily toward waiving his jury trial." His counsel continued, saying:

> "I've now just spoke to [Campbell] again in court after a couple of your rulings. I believe he wants to waive his jury trial in this matter, try and see if we can get a stipulated facts done, and if it can't be done, we can just do a bench trial . . ."

The district court then had the following exchange with Campbell:

> "THE COURT: Mr. Campbell, is that an accurate statement? You want to waive your jury trial?
> "DEFENDANT CAMPBELL: Yeah, in an effort to not just draw out more time because I really honestly would like to seek treatment and to resolve these matters as quickly as I can.
> "THE COURT: And you know if it's going to be stipulated facts that will have to be done by next Tuesday or Wednesday. And if you don't have stipulated facts by then, it will be a court trial. You understand that?
> "DEFENDANT CAMPBELL: Yes, ma'am."

The State said it would not agree to waive the jury trial on stipulated facts, but it would agree to waive the jury trial to a court trial without stipulated facts. The district court then explained that the State did not want to spend the time on stipulated facts and advised Campbell's counsel to "take some time and talk with Mr. Campbell about that and [the attorney for the State] will leave the courtroom, as will I, while you do that."

Upon returning to the record, the following occurred:

8

"THE COURT: Just a little recap. The State will not agree to waive the jury trial if it's on stipulation but will agree to waive the jury trial to a court trial. What has Mr. Campbell decided to do?

"[CAMPBELL'S COUNSEL]: I believe Mr. Campbell has decided to waive his jury trial and proceed on a bench trial.

"THE COURT: Mr. Campbell, is that right?

"DEFENDANT CAMPBELL: Yes, Your Honor.

"THE COURT: Have you had enough time now to consider this?

"DEFENDANT CAMPBELL: Yes.

"THE COURT: All right. Both sides now agree the jury trial is canceled and the court trial is set for Tuesday, March the 26th. . . ."

IV.     *Campbell's Bench Trial and Sentencing*

Before the start of Campbell's bench trial, his counsel requested an ongoing objection to the evidence collected from the car search and to the evidence resulting from the May 2017 car search in a separate case. The district court granted "an ongoing objection to all adverse rulings." The State called five witnesses—Officer Kennedy, Officer Trowbridge, Officer Walter, a Kansas Bureau of Investigation chemist, and the officer who conducted the May 2017 car search in the separate case against Campbell. Campbell did not call any witnesses or present any evidence. After closing arguments, the district court found Campbell guilty of all four counts.

On June 7, 2019, the district court sentenced Campbell in this case and in 18 CR 701. The district court imposed a controlling 111-month prison sentence for the primary conviction of distribution of methamphetamine and ran all secondary conviction sentences concurrent. But these sentences were run consecutive to another 111-month prison sentence imposed in Campbell's 18 CR 701 case, resulting in a combined sentence of over 18 years. Campbell appeals.

9

Campbell appeals his convictions, arguing the district court committed multiple errors—but this court will only address two—Campbell's claim that the district court failed to fully advise him of his right to a jury trial before accepting his waiver, and his claim that the district court erred in denying his motion to suppress evidence from the illegal search of his car. Campbell's other claims that the district court erred by admitting prior bad acts evidence and by applying an unconstitutional statutory rebuttable presumption for intent to distribute need not be addressed because he prevails on his other two claims entitling him to reversal of his convictions and a new trial.

I. *The district court failed to fully advise Campbell of his right to a jury trial before accepting his waiver.*

Campbell argues the district court failed to inform him he had a right to a jury trial and failed to address his alleged confusion about jury trial waiver—making his waiver unknowing and involuntary. The State contends that Campbell failed to properly preserve this issue for appellate review, but even if this court were to reach the issue, Campbell was in fact adequately advised of his jury trial right and validly waived it.

A. *Preservation and Standard of Review for Jury Trial Waiver*

It is well established that this court generally does not address constitutional claims raised for the first time on appeal, save for the times when a recognized exception makes such review permissible. *State v. Harris*, 311 Kan. 371, 375, 461 P.3d 48 (2020). Campbell concedes that he did not challenge his jury trial waiver to the district court, but argues that a well-recognized exception to the general prohibition permits this court's review because review is necessary to serve the ends of justice or prevent the denial of fundamental rights. See 311 Kan. at 375. The State disagrees.

Criminal defendants are not prohibited from questioning the validity of their jury trial waiver for the first time on appeal. *State v. Rizo*, 304 Kan. 974, 979, 377 P.3d 419 (2016). And as Campbell notes, "the fundamental nature of the right to jury trial," makes challenges to inappropriate jury trial waivers ripe for consideration when applying exceptions to the general rule prohibiting review of unpreserved constitutional claims. See *State v. Redick*, 307 Kan. 797, 802, 414 P.3d 1207 (2018). To ensure preservation of Campbell's fundamental right to a jury trial, this court will address the merits of his waiver challenge.

On appeal, this court reviews the factual question of whether the defendant waived their right to a jury trial for substantial competent evidence. In contrast, if "the facts of the district court's determination to accept a jury trial waiver are not disputed, the question whether the defendant voluntarily and knowingly waived the jury trial right is a legal inquiry subject to unlimited appellate review." *Harris*, 311 Kan. at 375. A defendant's waiver of the right to a jury trial must be strictly construed because a defendant deserves the opportunity for a fair and impartial jury trial if so desired. The first step in an effective jury trial waiver requires the court to advise the defendant of their right to a jury trial, and the second step requires the defendant to personally waive that right in writing or in open court on the record. This court must determine whether the defendant knew and understood the right and then voluntarily waived the right. 311 Kan. at 376.

B. *Campbell did not voluntarily and knowingly waive his jury trial.*

The parties do not dispute the facts supporting Campbell's jury trial waiver, so this court must conduct an unlimited review to determine whether Campbell voluntarily and knowingly waived his jury trial right. Campbell asserts, and the State concedes, that the district court did not inform Campbell that he had a right to a jury trial in this case. The district court briefly discussed Campbell's jury trial waiver with him at a preliminary

11

hearing but did not inform Campbell he had a *right* to a jury trial. As described earlier in this opinion, the district court discussed the jury trial waiver with Campbell, but that discussion lacked notification to Campbell of his right to a jury trial.

A review of the record shows that the district court did not "clearly and unequivocally advise the defendant that they have the right to have their case tried by a jury." See *Harris*, 311 Kan. at 376.

The State concedes Campbell was not advised of his jury trial right but argues that because Campbell was before the same court in another case and was informed of his jury trial right in that case, he was adequately informed of his jury trial right before waiving. But a district court cannot infer a defendant understands their jury trial right simply because the defendant previously participated in a bench trial. See *Harris*, 311 Kan. at 377. Moreover, a panel of this court recently found that Campbell's jury trial waiver in case 18 CR 701—the case relied on by the State for the contention that Campbell had been previously informed of his right to a jury trial and understood that right—was not made knowingly and voluntarily, and thus reversed his conviction in that very case on these same grounds. See *State v. Campbell*, No. 123,198, 2022 WL 731069, at *12 (Kan. App. 2012) (unpublished opinion). The State's argument holds no merit.

The district court's failure to inform Campbell of his jury trial right does not require automatic reversal. The goal is for a defendant to know and understand their fundamental right to a jury trial, not to set forth a checklist requirement for district courts before obtaining a waiver of that right. See *State v. Beaman*, 295 Kan. 853, 860-61, 286 P.3d 876 (2012). This purpose can be met even when the district court does not use the specific phrase "right to a jury trial," but it does require at least a "thoughtful exchange" with the defendant to ensure the waiver of a jury trial is knowing and voluntary. 295 Kan. at 860-62. In *Beaman*, this "thoughtful exchange" included the district court "fervently encourag[ing] Beaman to proceed with the jury trial, plainly indicating [that] alternative

12

was in his best interest." 295 Kan. at 859. "The district court also corrected Beaman's stated reason for wanting a bench trial by telling him that the victim and her family would still testify before the court," after Beaman had expressed part of the reason he wanted to waive was to avoid "taking the victim or her family through a jury trial." 295 Kan. at 855, 859.

The "thoughtful exchange" in *Beaman* cannot be found in this case. If Campbell displayed "confusion or a misunderstanding about trial by jury" the district court had a responsibility to "address those misconceptions and try to explain and clarify the right before accepting any purported waiver of that right." *Harris*, 311 Kan. at 377. Campbell expressed a desire to proceed with a court trial because he " . . . really honestly would like to seek treatment and to resolve these matters as quickly as I can," and the district court did not explain that Campbell's stated goal would not necessarily be facilitated by his waiver. Nor did the court explain that a jury trial would not preclude his seeking treatment. In fact, the district court did not engage Campbell about his choice other than to discuss the State's concern about timely establishing stipulated facts. Here, as in *Harris*, the district court framed the jury trial waiver as "a mere option" for Campbell and did not attempt to ensure he understood the right he was giving up through his waiver. See 311 Kan. at 376-77. Because the district court failed to inform Campbell of his right to a trial by jury, it had an obligation to engage in discussion to ensure Campbell understood his rights and made a knowing and voluntary waiver—but that thoughtful exchange is not present in this case. Thus, this court reverses Campbell's convictions and remands for a new trial.

II.     *The district court erred in denying Campbell's motion to suppress.*

Campbell argues that the district court erred in denying his motion to suppress evidence obtained from the illegal search of his vehicle because the State failed to meet its burden to show that it would have inevitably discovered the evidence obtained from

the illegal car search. Once again, the State contends Campbell failed to properly preserve his argument and this court should decline to reach it. In the event this court decides to address the merits, the State argues the officers who stopped Campbell's vehicle for traffic infractions had reasonable suspicion Campbell was involved in a drug transaction and would have inevitably found the drugs and paraphernalia in his car while investigating that suspicion.

A. *Campbell raised and preserved his objection to the district court's denial of his motion to suppress.*

The State concedes that Campbell challenged the admission of the evidence from the car search with the district court and that he obtained a continuing objection to the admission of the evidence at trial—but argues that because Campbell did not make this specific argument regarding inevitability to the district court, this court cannot reach the issue on appeal. Whether a party properly preserved an issue for appellate review is subject to unlimited review. *State v. Daniel*, 307 Kan. 428, 429-30, 410 P.3d 877 (2018). After a district court denies a defendant's motion to suppress, the moving party must generally still object to the introduction of that evidence at trial or make a standing objection to preserve the issue for appeal. *State v. Davis*, 312 Kan. 259, 273, 474 P.3d 722 (2020).

Campbell moved to suppress all evidence seized from the search of his car, arguing that any search beyond securing his gun was illegal and no exception saved the fruit of the illegal search. The district court held a hearing on Campbell's motion to suppress where the State conceded that the search was illegal because the officers' search exceeded Campbell's consent and the officers did not have probable cause to search the vehicle at the time. However, the State argued that an exception applied because the officers obtained independent probable cause and the officers would have inevitably discovered the items in the vehicle. At the hearing, Campbell's counsel reasserted the

14

arguments made in his motion to suppress and challenged the State's assertion of inevitable discovery—arguing the State did not provide enough evidence to establish independent probable cause or to tie that probable cause to the inevitable discovery of the evidence in Campbell's car. At a separate hearing on May 31, 2018, the district court denied the motion to suppress, finding that officers obtained independent probable cause to believe methamphetamine was in Campbell's car and that "the State has shown by a preponderance of the evidence that the methamphetamine would be inevitably discovered during the search based on that probable cause."

At the bench trial, Campbell's counsel sought an "ongoing objection to all evidence taken during the search of [Campbell's] vehicle," citing to the denial of his motion to suppress. The district court granted "an ongoing objection to all adverse rulings." Based on this record, this court finds that Campbell argued against inevitable discovery in arguing for the motion to suppress and then raised that as a continuing objection at trial which the district court granted, thus sufficiently preserving this claim for appeal.

B. *Standard of Review for Motions to Suppress*

A district court's decision to deny a motion to suppress is reviewed under a bifurcated standard—appellate courts first determine whether the factual findings are supported by substantial competent evidence, then review the ultimate legal conclusion de novo without reweighing the evidence or assessing witness credibility. When the facts supporting the district court's decision on a motion to suppress are undisputed, the ultimate question of suppression is a question of law over which appellate courts exercise unlimited review. The burden is on the State to establish the lawfulness of the warrantless search and seizure. *State v. Hanke*, 307 Kan. 823, 827, 415 P.3d 966 (2018).

15

The State argued, and the district court agreed, that although the officers conducted an illegal, warrantless search of Campbell's car, the inevitable discovery exception to the exclusionary rule saved the fruits of the illegal search.

C. *The State did not meet its burden to show inevitability.*

As a general rule, officers must have a warrant to search a vehicle. See, e.g., *State v. Doelz*, 309 Kan. 133, 140, 432 P.3d 669 (2019) ("We start with the premise that a warrantless search by a police officer is per se unreasonable under the Fourth Amendment unless the State can fit the search within one of the recognized exceptions to the warrant requirement. [Citation omitted.]") When officers run afoul of this general rule, the courts exclude evidence from trial seized from that wrongful search under the exclusionary rule which "prohibits the introduction of evidence obtained in violation of the Fourth Amendment in order to deter future violations." See *State v. Baker*, 306 Kan. 585, 590, 395 P.3d 422 (2017). The inevitable discovery doctrine is one of many exceptions to the exclusionary rule—permitting the introduction of this otherwise excluded evidence if it "'would have been discovered even without the unconstitutional source.'" 306 Kan. at 591. The State can use otherwise excluded evidence if it proves by a preponderance of the evidence that the unlawfully obtained evidence would have "ultimately or inevitably" been discovered by lawful means, separate from the unconstitutional source. 306 Kan. at 590-91.

Here, the material facts supporting the district court's denial of Campbell's motion to suppress are not disputed, so this court exercises unlimited review over the ultimate legal question of suppression. *Hanke*, 307 Kan. at 827. This question hinges on whether the State met its burden to prove inevitable discovery by a preponderance of the evidence. This evaluation will not require the court to reweigh the evidence, but to determine the sufficiency of the evidence presented when viewed in favor of the State.

16

Officers Kennedy and Trowbridge both testified for the State at the preliminary hearing about the events preceding and during the search of Campbell's car—both asserting that the information relayed from the witness at the apartment complex provided independent probable cause to search Campbell's car. In fact, the district court devoted a large amount of the hearing to determining whether the information from the witness established independent probable cause to search the vehicle. Yet there was no testimony or evidence presented establishing that the information from the witness would have inevitably led to the discovery of the drugs and paraphernalia in Campbell's car given the circumstances of the vehicle stop.

Based on the dashboard camera footage of the stop, Officer Trowbridge secured the gun and completed his sweep of the immediate area surrounding the gun approximately 11 minutes into the stop. Officer Trowbridge testified at the motion to suppress hearing that after he completed this initial search, about a minute later they received the information about the woman in Campbell's car which gave officers probable cause to search Campbell's vehicle. But Officer Trowbridge's timeline is inaccurate—the dashboard camera footage shows that Officer Kennedy received the call about the woman around 18 minutes into the stop, which was almost seven minutes after Officer Trowbridge had secured the gun and completed his sweep of the area around the gun. During that almost seven minutes, Officer Trowbridge had continued searching Campbell's car. After Officer Kennedy received the call about the woman, Officer Trowbridge continued to search the car for another five minutes before finding the methamphetamine in the hat which underpins the distribution charge against Campbell. There is a considerable amount of time between when Officer Trowbridge located the gun, which also took several minutes of searching, and when the officers with Campbell received the phone call establishing probable cause that methamphetamine might be found in the car.

Campbell argues that, even if the information from the woman created valid probable cause to search his car—the State failed to show that the timing of that probable cause meant the officers would have *inevitably* found the paraphernalia and drugs in his car. Campbell argues that the State needed to prove that he would not have been released before they developed probable cause or that no one would have been able to pick up Campbell's car or retrieved items from his car before officers developed probable cause.

The State presented evidence that although Campbell was not arrested until after the methamphetamine was found, he was not free to leave from the initial stop and was being detained for driving with a suspended license, having an illegal tag on his car, and for reasonable suspicion that he had committed a sale of drugs. Officer Kennedy also testified that although Campbell was subject to being arrested for his traffic infractions, those infractions would not have allowed the officers to search Campbell's car. In slight contradiction, Officer Trowbridge testified that Campbell was "being detained relative [to] the driving while suspended or revoked and the tags not being assigned," but that "once the methamphetamine pipe was located and Officer Kennedy related the information from the other detectives, [Campbell] was not free to leave."

This is the extent of the evidence the State presented regarding inevitability. The State did not provide testimony or evidence to show that Campbell's car or possessions within it would not have been able to be removed from the scene before the officers received the call creating probable cause. Campbell's car was located in an apartment complex parking lot, not impeding traffic, and was free to remain there for some time. The State had the burden to prove not only that the officers eventually obtained probable cause separate from their initial illegal search, but that such probable cause "ultimately or inevitably" would have led to the evidence in Campbell's car being discovered. See *Baker*, 306 Kan. at 590-91. While the State's burden is a mere preponderance of the evidence, the record reveals the State provided no evidence regarding the inevitability of

18

Campbell's car and the items within his car remaining at the scene until the officers obtained probable cause to search—roughly 18 minutes into the traffic stop.

The inevitable discovery exception requires two findings—first, that independent probable cause existed supporting the arrest and second, that the circumstances show that the independent probable cause would have inevitably led to the discovery of the illegally seized evidence. See, e.g., *Baker*, 306 Kan at 592-94 (explaining the inevitable discovery exception). Here, the district court only reached the first step. The Kansas Supreme Court has declined to apply the inevitable discovery exception when the State, as here, has failed to present sufficient evidence of inevitability. See, e.g., *Baker*, 306 Kan. at 592-94 (finding that the State's failure to provide any evidence of a policy or routine regarding opening containers during inventory searches was fatal to the State's inevitable discovery claim); *State v. Fitzgerald*, 286 Kan. 1124, 1132-33, 192 P.3d 171 (2008) *abrogated on other grounds by State v. Sanchez-Loredo*, 294 Kan. 50, 272 P.3d 34 (2012) (finding that when the State fails to put on evidence to meet its burden of proving inevitability, the inevitable discovery doctrine does not apply). The State has the burden to establish that a lawful exception permits use of evidence obtained from a warrantless search, and "a court cannot draw inferences in favor of the State based on a *lack* of contrary evidence." See *State v. Bunce*, No. 119,048, 2020 WL 122642, at *5 (Kan. App. 2020) (unpublished opinion). The State failed to prove inevitability. This court finds that the district court erred in denying Campbell's motion to suppress.

CONCLUSION

Campbell appeals his convictions on several grounds, but this court addresses only two as they are dispositive. The district court failed to ensure Campbell knowingly and voluntarily waived his right to a jury trial, and under well-established precedent, that failure entitles Campbell to a new trial. In addition, the district court erred by denying Campbell's

19

motion to suppress the evidence seized from the warrantless search of his vehicle because the State failed to show it would have inevitably been discovered.

Reversed and remanded.